UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GALLUP MED FLIGHT, LLC,

    Plaintiff,

v.                                               Case No. 1:16-CV-01234 JB-LF

BUILDERS TRUST OF NEW MEXICO,

    Defendant.

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS**

    Plaintiff Gallup Med Flight, LLC ("GMF") by and through its counsel of record, Keleher & McLeod, P.A., Jeffrey A. Dahl and Andrew L. Johnson, hereby files this Motion for Judgment on the Pleadings and moves this Court to grant the relief sought in GMF's Complaint for Debt and Money Due and Breach of Contract ("Complaint").  GMF is entitled to the relief sought in its Complaint as a matter of law as there are no material facts which dispute the relief sought by GMF.  Defendant opposes this motion.

**MATERIAL FACTS**

    1.        GMF is a New Mexico company with its principal place of business in Gallup, New Mexico.

    2.        GMF provides emergency air ambulance services within the State of New Mexico and to destinations in nearby states using fixed and rotary wing aircraft.

    3.        GMF performs emergency air transports under the authority granted by the Federal Aviation Administration ("FAA") to operate as a Part 135 air carrier, and was registered with the United States Department of Transportation ("DOT") to operate as a Part 298 air taxi operator, providing on-demand air ambulance services.  Pursuant to these certifications, GMF is authorized

to operate interstate flights is an "air carrier" for purposes of the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b).

4. On or about October 5, 2015 Michael Woods was a patient at the Rehoboth McKinley Christian Hospital Health Care Services Emergency Department ("RMCH") in Gallup, New Mexico, where he was receiving emergency medical treatment for an injury he suffered while working for his employer, Murphy Builders.

5. Upon information and belief, Defendant Builders Trust of New Mexico ("BTNM") provides workers' compensation insurance to Murphy Builders.

6. Unable to adequately treat Mr. Woods' medical condition, Mr. Woods' treating physician assistant, Floyd Badden, PA-C, upon approval by Dr. Kenneth Kelly, MD, arranged to transfer Mr. Woods from RMCH to University of New Mexico Hospital ("UNMH") in Albuquerque, New Mexico for treatment.

7. Based on the distance between the medical facilities, the unavailability of ground transportation and Mr. Woods' medical condition, a medical transport fixed wing aircraft from GMF was dispatched by Floyd Badden, PA-C, approved by Dr. Kelly, MD, to provide air medical transportation for Mr. Woods.

8. Mr. Woods was safely transported by GMF to UNMH in Albuquerque pursuant to the protocols set forth under the Emergency Medical Treatment and Active Labor Act ("EMTALA").

9. Congress enacted EMTALA as a way to combat "patient dumping" – the practice of a hospital that, despite having the resources to provide medical care, refuses to treat or transfers a patient who is unable to pay for medical services. *See* Melissa K. Stull, Construction and

Application of Emergency Medical Treatment and Active Labor Act (42 U.S.C.A. § 1395dd), 104 A. L R. Fed. 166, § 2 (1991).

10. Under the statute, if an individual comes to the emergency department of a hospital and requests treatment, the hospital must examine the person to determine if an emergency medical condition ("EMC") exists. *See* § 1395(dd)(a). If there is a medical emergency, the hospital must provide either the additional examination or treatment that is necessary to stabilize the EMC or else transfer the patient to another medical facility in accordance with the statute's transfer provisions. *See* § 1395(dd)(b)(1). Only those patients that have an unstabilized EMC are transferred.

11. The hospital is also required to ensure that the patient is "stable" prior to the transfer. This meaning of "stable" is defined, "to provide such medical treatment of the condition as may be necessary to assure that, within reasonable medical probability, no material deterioration of the condition is likely to result from the transfer of the individual from a facility". (*See* 42 CFR 489.24(b)).

12. If the transfer was not medically necessary, the CMS Guidelines provide that the receiving hospital is "required to report to CMS or the State survey agency" the EMTALA violation within 72 hours when it suspects that it has received an "improperly transferred individual". (*See* CMS Guidelines) We are not aware of any such reporting relating to this patient.

13. EMTALA requires the receiving hospital to accept the transfer if they provide higher care. The statute and the regulations provide that any participating hospital which has "specialized capabilities or facilities" such as burn units, shock-trauma units, or neonatal intensive care units, or which is a "regional referral center" in a rural area, may not refuse to accept a patient in transfer, if it has the capacity to treat the individual. [42 USC 1395dd(g); 42 CFR 489.24(f)]

The receiving hospital will be obligated to accept the transfer in most cases, so long as it has the ability to treat the patient and its capabilities exceed those of the referring hospital, even if only because of overcrowding or temporary unavailability of personnel. (http://www.emtala.com/faq.htm).

14. EMTALA also requires hospitals that accept payment under the Medicare program to provide emergency health care treatment to anyone in need regardless of citizenship, legal status, or ability to pay. The Regulation provides:

> [a] participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) of this section or further medical examination and treatment required under subsection (b) of this section in order to inquire about the individual's method of payment or insurance status.

42 C.F.R. § 489.24(d).

15. Because of the emergent nature of the services, GMF provides emergency air transportation to anyone in need regardless of citizenship, legal status, or ability to pay. GMF does not generally inquire about the individual's method of payment or insurance status at the time of the transport.

16. GMF is not self-dispatching and is generally called upon to provide transports because medical facilities providing emergency care must comply with the EMTALA and must follow certain of EMTALA's implementing regulations, *See* 42 C.F.R. § 489.24. EMTALA is codified at 42 U.S.C. § 1395dd ("Statute"). The federal regulations which implement EMTALA are found at 42 C.F.R. § 489.24 ("Regulations"). The Regulations, while similar to the Statute, contain additional provisions relevant to the enforcement and interpretation of the Statute by Centers of Medicare and Medicaid Services ("CMS").

17. CMS specifically mandates that it is "the treating physician at the transferring hospital who decides how the individual is transported to the recipient hospital and what transport

service will be used, since this physician has assessed the individual personally.  The transferring hospital is required to arrange transport that minimizes the risk to the individual who is being transferred, in accordance with the requirements of § 489.24[(e)(2)(iv)]."

18.     EMTALA places the responsibility on the transferring hospital to ensure that the Statute's requirements are met.  As to a transport from a transferring hospital, the Statute requires that the patient be accompanied by "qualified personnel and transportation equipment." 42 U.S.C. § 1395dd(c)(2)(D).  It is the transferring hospital's obligation to ensure that the provider meets the criteria.  The EMTALA obligation continues with and during the transfer as "the transferring hospital must provide ongoing care within its capability until the transfer to minimize transfer risks."

19.     GMF is called by a hospital to provide emergency transportation because it has "qualified personnel and transportation equipment" to provide critical emergency air transportation for those in dire medical need of such transportation. An air emergency provider is generally selected and dispatched by a patient's treating physician (almost exclusively from hospitals and emergency rooms) because, in addition to being an EMTALA qualified provider, the provider also has favorable estimated transport times. (*See* U.S. Government Accountability Office (GAO) report to Congress in September 2010, "Air Ambulance: Effects of Industry Changes on Services Are Unclear:  GAO-10-907").

20.      As GMF an "air carrier" (as that term is defined in ADA), GMF sets a market rate for the transport that consists of a lift-off fee and a mileage fee, that combined represents GMF's billed charges ("Billed Charges").

21.     The ADA expressly states that it is in the public interest to place "maximum reliance on competitive market forces and on actual and potential competition (A) to provide the

needed air transportation system, and (B) to encourage efficient and well-managed carriers to earn adequate profits and to attract capital." *See* Pub. L. No. 95-504, § 3(a).

22. To prevent state interference with its objective, Congress included a preemption provision in the ADA that prohibits a State from enacting or enforcing any statute, regulation or other provision of law "related to a price, route, or service of an air carrier." *See* Pub. L. No. 95-504, § 4 (a) (currently codified at 49 U.S.C. § 4 17 13 (b)).

23. The U.S. Department of Transportation ("DOT") has taken the position that the ADA's preemption provision applies to the field of air ambulance services (*See* April 2015, DOT Guidelines for the Use and Availability of Helicopter Emergency Medical Transport ("Guidelines"). The Guidelines affirm:

Once the Secretary certificates an air ambulance operator, the competitive marketplace, rather than state regulations, controls the operator's prices, routes, and services, and only the Secretary may revoke an air ambulance operator's certificate.

24. After the completion of the Mr. Woods' transport, GMF billed BTNM the amount that GMF normally charges (heretofore referred to as "Billed Charges") in the amount of $58,834.29.

25. Instead of paying GMF's normal Billed Charges, BTNM admits that it paid $10,477.36 ("Paid Amount") to GMF. (Answer ¶ 23 [Doc. 3]).

## BACKGROUND INFORMATION

Medical facilities providing emergency care must comply with the EMTALA, codified at 42 U.S.C. § 1395dd ("Statute"), and must follow certain of EMTALA's implementing regulations found at 42 C.F.R. § 489.24 ("Regulations"). The Regulations, while similar to Statute, contain additional provisions relevant to the enforcement and interpretation of the Statute by Centers of

Medicare and Medicaid Services ("CMS"). CMS specifically mandates that it is "the treating physician at the transferring hospital who decides how the individual is transported to the recipient hospital and what transport service will be used, since this physician has assessed the individual personally. The transferring hospital is required to arrange the transport that minimizes the risk to the individual who is being transferred, in accordance with the requirements of § 489.24[(e)(2)(iv)]." CMS Manual System, Pub. 100-07 State Operations Provider Certification, P. 47 (Transmittal 46, May 29, 2009) (https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R46SOMA.pdf).

EMTALA places the responsibility on the transferring hospital to ensure that the Statute's requirements are met. For transports from a transferring hospital, Statute requires that the patient be accompanied by "qualified personnel and transportation equipment". 42 U.S.C. § 1395dd (c)(2)(D). It is the transferring hospital's obligation to ensure that the provider meets the Statute criteria. The EMTALA obligation continues with and during the transfer as an appropriate transfer requires "the use of necessary and medically appropriate life support measures during the transfer." 42 U.S.C. § 1395dd(c)(2)(D).

EMTALA requires hospitals that accept payment under the Medicare program to provide emergency health care treatment to anyone in need regardless of citizenship, legal status, or ability to pay. The Regulation provides:

> [a] participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) of this section or further medical examination and treatment required under subsection (b) of this section in order to inquire about the individual's method of payment or insurance status.

42 C.F.R. § 489.24(d).

Under the Supremacy Clause, federal law may supersede, or preempt, state law in several different ways, including: (1) Congress may expressly state that federal law preempts state law

(express preemption); (2) Congress' intent to preempt state law may be inferred from its comprehensive regulation of an area of law (field preemption); or (3) state law may actually conflict with the federal law (conflict preemption) - i.e., where compliance with both federal law and state law is a physical impossibility, or where the state law stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress.

The ADA expressly states that it is in the public interest to place "maximum reliance on competitive market forces and on actual and potential competition (A) to provide the needed air transportation system, and (B) to encourage efficient and well-managed carriers to earn adequate profits and to attract capital." Pub. L. No. 95-504, § 3(a). In order to ensure that an air carrier has the unfettered ability to effectively and efficiently operate, the ADA includes a preemption clause that prohibits States from enacting or enforcing laws that have "a connection with, or reference to" an air carrier's prices, routes or services. Price is the "central nervous system of the economy." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226, n. 59, 60 S. Ct. 811, 84 L. Ed. 1129 (1940).

In 1978, Congress amended the Federal Aviation Act of 1958, 49 U.S.C. §§ 40101 et seq., and enacted the ADA with the intention of deregulating the aviation industry. Congress' objective was to help "assure transportation rates, routes and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008) (citations omitted); *Morales v. TWA*, 504 U.S. 374, 378, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992) (ADA's purpose was to promote "maximum reliance on competitive market forces"); *see also* 49 U.S.C. § 40101(a)(12) ("an air transportation system relying on actual and

potential competition" would best further "efficiency, innovation, and low prices"); *Northwest, Inc. v. Ginsberg*, 572 U.S. __, 134 S. Ct. 1422, 1428, 188 L. Ed. 2d 538 (2014).

Specifically, the ADA's preemption clause provides:

a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide transportation under this subpart.

49 U.S.C. § 41713(b)(1). In addition to preventing state interference with federal deregulation, the clause was intended to "prevent conflicts and inconsistent regulations" by the federal government and the fifty states. H.R. Rep. No. 95-1211, at 16 (1978). One essential purpose of the ADA preemption provision was to free air carriers from the "patchwork" of state regulatory requirements that had developed prior to the FAAAA's enactment. H.R. Conf. Rep. No. 103-677, at 87, reprinted in 1994 U.S.C.C.A.N. at 1759. Congress concluded that such inconsistent regulation "causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets." *Id*. Congress further explained that "[t]he sheer diversity of these regulatory schemes is a huge problem for national and regional carriers attempting to conduct a standard way of doing business." *Id.*

The U.S. Supreme Court addressed the ADA's applicability and scope in three cases, *Morales v. Trans World Airlines, Inc.*, supra, *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995), and *Northwest, Inc. v. Ginsberg*, supra. In each case, the Court painted the ADA with a broad stroke, holding that the phrase "related to" means that the claim must have "a connection with, or reference to" an air carrier's prices, routes or services. *See*, e.g., *Ginsberg*, 134 S. Ct. at 1430; *Morales*, 504 U.S. at 384.

In *Morales*, the Supreme Court relied on the ADA's "broad pre-emptive purpose" in holding that state attorney general guidelines setting standards for fare advertising, frequent flyer

9

awards, denied boarding compensation, and other matters related to airfares and were preempted by the ADA. *Morales*, 504 U.S. at 385.  The Supreme Court recognized the expansive scope of preemption under the ADA was to "express a broad pre-emptive purpose," that it has a "broad scope" and "expansive sweep," and is both "deliberately expansive" and "conspicuous for its breadth." *Morales*, 504 U.S. at 383-84. Given this expansive language, the Supreme Court rejected the suggestion that the ADA prevents states only from "actually prescribing rates, routes, or services", that it applies only to laws specifically addressed to the airline industry or that it preempts only state laws that are inconsistent with federal laws. *Id*. at 385-86. Instead, the Supreme Court held that the ADA preempts any state law having a connection with or reference to an airline's rates, routes or services, unless that connection or reference is "too tenuous, remote, or peripheral . . . to have preemptive effect." *Id*. at 390.

Two years later, Congress codified the *Morales* decision when it reenacted Title 49 of the U.S. Code in 1994. Although Congress made technical amendments to the ADA's preemption provision, Congress stated that it intended no substantive change in the statute. *See* Pub. L. 103-272, § 1(a), 108 Stat. 745 (1994). By reenacting the ADA without change, Congress made the broad preemption interpretation that this Court had established in *Morales* part of the statute. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66, 102 S. Ct. 1825, 72 L. Ed. 2d 182 (1982) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *see also DOT v. Public Citizen*, 541 U.S. 752, 770 n.4, 124 S. Ct. 2204, 159 L. Ed. 2d 60 (2004).

The following year, in *Wolens*, the Supreme Court reaffirmed the wide breadth of ADA preemption, holding that the plaintiff's state consumer protection law claim challenging

modifications to the air carrier's frequent flyer program related to the air carrier's prices and services because changes to the rewards program impacted access to flights, free tickets, and upgrades. *Wolens*, 513 U.S. at 225-27. In finding preemption, the Court recognized that state consumer protection statutes have the "potential for intrusive regulation of airline business practices" and would improperly police an air carrier's marketing practices. *Id*. at 227 28. In sum, the Supreme Court held that a state "may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier," whether by statute or common law or equitable contract doctrines. *Id*.

In *Ginsberg*, the Supreme Court held preempted plaintiff's claim for breach of the implied covenant of good faith and fair dealing because the covenant was a state-imposed obligation, not a voluntary undertaking by the parties. Significantly, the Court emphasized that "[w]hat is important" for preemption is "the effect of a state law, regulation or provisions, not its form." 134 S. Ct. at 1430.

The federal courts, in unanimity, have held that any state law having a connection with or reference to an airline's rates, routes or services is preempted. Recently, the State of North Dakota in *Valley Med Flight, Inc. v. Dwelle*, 171 F.Supp.3d 930 (D.N.D. 2016) was enjoined when they attempted to enact a newly passed law that regulated an air carrier and attempted to enforce a fee schedule under their workers compensation scheme. The court held that both statutes interfered with an air carrier providing emergency services.  The court found that the North Dakota Workers Compensation statute prohibited an air ambulance provider from balance billing the worker for "the difference between the maximum allowable fee set forth in the organization's fee schedule and usual and customary charges" by the air ambulance provider. *Id.* at 942.  In enjoining the statute, the court held that these provisions collectively mandate the reimbursement rates for air

ambulance services and impermissibly prohibit balance billing to the employer, employee, or other insurer in violation of the ADA's express preemption clause, and "agrees that the only fair characterization of these provisions is that they directly impact Valley Med's prices and services under the ADA." *Id.* at 943.

The United States District Court for the District of Wyoming recently enjoined the State of Wyoming from enforcing a fee schedule that limited an air carrier's payment to a "reasonable charge" for services. In finding that the ADA requires air carriers to set rates, the district court reasoned that operators, because of the 24/7/365 operations, must price their services to cover the cost of readiness. In addition, operators, "when setting prices . . . must estimate their volume and mix of paying and non-paying transports" and that "the rapid response required in an emergency flight obviates any opportunity to negotiate price and terms." *Eaglemed, LLC, et al. v. State of Wyoming, et al*, No. 15-CV-0026-ABJ (D.WY. May 16, 2016). (Order, pp. 30-31 [Doc. 45]).

The Department of Transportation has exclusive jurisdiction for executing and enforcing airline consumer rights laws established by Congress. The DOT may also develop regulations based on more general statutory authority, giving it broad powers to prescribe regulations, standards, and procedures related to air travel. (*See* 49 U.S.C. § 40113) More specifically, DOT has authority "under 49 U.S.C. Section 41712, in concert with 49 U.S.C. Sections 40101(a)(4), 40101(a)(9), and 41702 to protect consumers from unfair or deceptive practices and to ensure safe and adequate service in air transportation." (*See* Department of Transportation, "Enhancing Airline Passenger Protections," 74 FR 68983, December 30, 2009). In a letter to the Arizona Attorney General, the Office of General Counsel advised that the congressionally mandated preemption provision "directs DOT to fully occupy economic regulation of air carriers" (*See* June 16, 1986 DOT opinion letter to the Arizona Assistant Attorney General, Chip Wagoner).

The Office of the General Counsel for the U.S. Department of Transportation has reinforced this expansive view of ADA preemption and reliance on market forces, specifically in the air ambulance context. The DOT expressly recognizes that air ambulance operators certified by the FAA are air carriers entitled to the protections afforded by the ADA. *See* U.S. DOT "Guidelines for the Use and Availability of Helicopter Emergency Medical Transport" ("DOT Guidelines") at P. 9 ("[a] company that provides air ambulance services and holds an FAA air carrier certificate constitutes an air carrier for purposes of the ADA"); *see also* Legal Opinion of James R. Dann, Deputy Assistant General Counsel at DOT, dated Feb. 20, 2007, ("any operator with Federal air carrier authority is to be accorded the protections of the Federal preemption provision, regardless of precise flight operations").  In the DOT Guidelines, the Office discusses federal and state regulatory authority over air ambulance operators and summarizes several legal opinions on FAA and ADA preemption in air ambulance cases.  In discussing DOT's exclusive power to issue certificates of authority to air ambulance operators, the Office notably stated:

> Once the Secretary [of Transportation] certificates an air ambulance operator, the competitive marketplace, rather than state regulations, controls the operator's prices, routes, and services, and only the Secretary may revoke an air ambulance operator's certificate.

DOT Guidelines at P. 12.

## **LEGAL STANDARD**

Judgment on the pleadings may be granted if the moving party clearly establishes that no material fact remains to be resolved, and that the party is entitled to judgment as a matter of law. *See Park Univ. Enterprises, Inc. v. Am. Cas. Co. of Reading, Pa.,* 442 F.3d 1239, 1244 (10th Cir. 2006).  The Court may examine the pleadings and any facts of which the Court can take judicial notice.  *See Ramirez v. Wal-Mart Stores, Inc.,* 192 F.R.D. 303, 304 (D.N.M. 2000).  "A motion for

judgment on the pleadings will be granted if the pleadings demonstrate that the moving party is entitled to judgment as a matter of law." *Id.*

## ARGUMENT

Contrary to Defendant's argument in its Answer, GMF is entitled to obtain the remedies sought in this case. GMF agrees with BTNM that the New Mexico Workers' Compensation Statute and Rules are not pre-empted by the ADA. Because the ADA does not pre-empt the New Mexico Workers' Compensation Act ("NM Act"), the reverse pre-emption doctrine of the McCarren Ferguson Act is not ripe for adjudication in this case, but the defenses raised by Defendant in its Answer are pre-empted by the ADA. Thus, this Court should grant the relief sought by GMF in its Complaint.

### I.    The ADA has not preempted the New Mexico Workers' Compensation Act.

"Our primary goal is to ascertain and give effect to the intent of the Legislature. In doing so, we examine the plain language of the statute as well as the context in which it was promulgated". *State v. Office of Pub. Defender,* 2012-NMSC-029, ¶ 13, 285 P.3d 622 (internal citation omitted). BTNM asserted in its Answer that the "Airline Deregulation Act does not … preempt the New Mexico Workers' Compensation Act or the New Mexico workers' compensation proceedings." (Answer, Affirmative Defenses, ¶ 6 [Doc. 3]). GMF agrees. The Director of the New Mexico Workers' Compensation Administration is mandated to set a fee schedule. NMSA 1978, § 52-4-5(A) (1993). The NM Act is not written in a manner that relates to air ambulance rates or services nor does the fee schedule include in its over 9,100 services a provision for payment to air carriers. It appears that New Mexico has simply chosen to avoid the issues of the ADA by not setting a fee schedule for an air carrier.

As air carrier rates seem to be intentionally omitted from the NM Act fee schedule, the NM Act provides for such a situation, providing that a "health care provider shall be paid his usual and customary fee for services rendered or the maximum charge established pursuant to Subsection A of this section, whichever is less." NMSA 1978, § 52-4-5(B) (1993). Section 11.4.7.7(AA) of the New Mexico Administrative Code ("NMAC") defines "Usual and customary fee" as "the monetary fee that a practitioner normally charges for any given health care service." BTNM has refused to pay the usual and customary fee charged by GMF and GMF is prohibited from balance billing Mr. Woods for the services rendered by GMF. 11.4.7.8(C)(2) NMAC.

As the NM Act and NMAC does not impose a maximum rate that may be charged by GMF and instead requires that GMF be paid the usual and customary fee, the ADA does not pre-empt the NM Act or NMAC. BTNM's statement in its Notice of Removal that "Plaintiff seeks to compel BTNM to pay increased air ambulance fees/rates and bad faith damages, alleging that the ADA preempts the establishment of State regulation and review of its rates, including review by the New Mexico Workers' Compensation Administration" (Notice of Removal, ¶ 2 [Doc. 1]) is not a true statement. Yes, the ADA preempts the establishment of New Mexico regulation of air carrier rates, but, the NM Act has not attempted to establish air ambulance rates thus there is nothing to be pre-empted. Further, GMF is not seeking to compel BTNM to pay increased air ambulance fees/rates but is in fact requesting to be paid its usual and customary fees. GMF's charges for the transport of Mr. Woods are in harmony with the NM Act and NMAC as they represent the usual and customary fee charged by GMF. Although GMF declined to submit itself to the jurisdiction of the New Mexico Workers' Compensation Administration ("WCA") this declination was not an argument of preemption because, as shown above, the NM Act and the WCA have not set rates for air ambulance services. BTNM acknowledged that GMF's Complaint is "not based on the

New Mexico workers' compensation statute or regulations". (Notice of Removal, ¶ 3 [Doc. 1]). BTNM asserted in its Notice of Removal that it, along with other insurance companies, "dispute[s] that Congress actually intended the ADA to preempt state workers' compensation laws and regulations." (Notice of Removal, ¶ 15 [Doc. 1]). There is no New Mexico workers' compensation law or regulation which sets or establishes air ambulance rates beyond usual and customary fees. Therefore, there is nothing left for further determination as the statutory language is unambiguous and the statutory scheme is coherent and consistent. Therefore, this Court should grant GMF its requested relief.

BTNM does not argue or assert that GMF charged more than their normal rate for the transport of Mr. Woods, but instead states that "[t]here was an honest dispute regarding the value of Plaintiff's claim and BTNM is entitled to contest the amount claimed by Plaintiff." (Answer, Affirmative Defenses, ¶ 5 [Doc. 3]). The NMAC requires that GMF be paid the amount that it "normally charges for any given health care service". The amounts charged for the transport of Mr. Woods was the amount that GMF normally charges.

## II.     The ADA Preempts BTNM's Affirmative Defenses.

"[T]he ADA permits state-law-based court adjudication of routine breach-of-contract claims." *Wolens*, 513 U.S. at 232. In *Ginsberg,* the United States filed an Amicus Curiae brief wherein it argued that:

> [T]his court has construed the ADA's preemption provision in a more limited manner. Reading it together with the ADA's saving clause, which preserves "the remedies now existing at common law or by statute," the Court held that the preemption provision permits "routine breach-of-contract claims" but "stops States from imposing their own substantive standards with respect to rates, routes, or services." *Wolens,* 513 U.S. at 232 (quoting 49 U.S.C. App. 1506 (1988)) (codified at 49 U.S.C. 40210(c); *see also id.* at 233, n. 8.9.

Brief for the United States as Amicus Curiae, *Ginsberg,* P. 32.

BTNM's allegation that GMF's Complaint "seeks additional moneys and bad faith damages under the ADA" is erroneous.  (Notice of Removal, ¶ 3 [Doc. 1]).  GMF did not file its Complaint in state court under the ADA but filed under state law for collection of debt and money due, breach of contract and breach of covenant of good faith and fair dealing.  The ADA does not create a private right of action. *Sam L. Majors Jewelers v. ABX Inc.*, 117 F.3d 922, 925 (5th Cir. 1997).  BTNM correctly claims that "The Airline Deregulation Act does not entitle Plaintiff to obtain the remedies sought in this case" and GMF has filed no such claims in the state court action.  (Answer, Affirmative Defenses, ¶ 6 [Doc. 3]).  However, there is no legal basis for BTNM to argue that GMF's state law claims were either filed under the ADA or preempted by the ADA.

Although the ADA has not preempted GMF's state law breach of contract claims against BTNM, there are instances where certain claims asserted against an air carrier, such as GMF, are preempted.  In *Wolens*, the Supreme Court recognized that state consumer protection statutes have the "potential for intrusive regulation of airline business practices". *Wolens,* 513 U.S. at 227-228.  In sum, states "may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier," whether by statute or common law or equitable contract doctrines. *Id.* "Unclean hands", "laches", "waiver" and "estoppel" are not contract terms but are "equitable principles" under New Mexico law. *See Hopkins v. Hopkins,* 1989-NMCA-101, ¶ 18, 109 N.M. 12 233, 784 P.2d 420; *Mask v. Mask*, 1980-NMSC-134, ¶ 5, 95 N.M. 229, 620 P.2d 883 13 (stating that because that "case arose in the context of a contempt proceeding . . . 14 equitable principles [were] applicable"); *Corliss v. Corliss*, 1976-NMSC-023, ¶ 3, 15, 89 N.M. 235, 549 P.2d 1070 and *Morris v. Ross*, 58 N.M. 379, 271 P.2d 823 (1954).

BTNM's affirmative defenses are preempted by the ADA.  BTNM asserted in its Answer that GMF's "hands are barred in whole or in party by unclean hands, laches, waiver, estoppel

and/or ratification." (Answer, Affirmative Defenses, ¶ 10 [Doc. 3]). BTNM further asserted that "Plaintiff's claims are barred, in whole or in part, by comparative bad faith or comparative fault or failure to timely comply with policy preconditions to suit." (Answer, Affirmative Defenses, ¶ 12 [Doc. 3]). Thus, even though GMF's claims are neither preempted, nor brought under, the ADA, BTNM's affirmative defenses are preempted by the ADA.

Because the parties agree that the ADA does not preempt the NM Act, the reverse preemption doctrine of the McCarren Ferguson Act is not applicable and the issue raised by BTNM in its Affirmative Defenses is not ripe for adjudication in this case.

## CONCLUSION

The NM Act, NMAC and WCA do not set fees that GMF may charge nor do they prohibit GMF from charging its usual and customary fees. Instead the NM Act and NMAC explicitly allow GMF to charge its usual and customary fees. GMF did not bill beyond its usual and customary fees. The Airline Deregulation Act does not preempt GMF's charges billed to BTNM nor does it prohibit GMF from pursuing its state law claims against BTNM. Therefore, GMF respectfully requests this Court grant this Motion for Judgment on the Pleadings and order that BTNM pay GMF's billed charges in the amount requested in the Complaint and that this Court enjoins BTNM from asserting any equitable defenses to the contract under the preemption of the ADA and dismiss those affirmative defenses which are preempted.

Respectfully submitted,

**KELEHER & McLEOD, P.A.**

By: _____*/s/ Jeffrey A. Dahl*_____
    Jeffrey A. Dahl
    Andrew L. Johnson
    P.O. Box AA
    Albuquerque, NM  87103
    (505) 346-4646 telephone

jad@keleher-law.com<br>*Attorneys for Plaintiff*

## **<u>Certificate of Service</u>**

  It is hereby certified that a true and correct copy of the foregoing was filed, via the Court's electronic filing system, and thus was served to all parties of record on this _____ day        of December, 2016.

 */s/ Jeffrey A. Dahl*
Jeffrey A. Dahl

4815-7050-1693, v. 1